# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN  DIVISION

MID-MISSOURI WASTE SYSTEMS, LLC,   )
        )
        Plaintiff,   )
vs.        )    No. 07-233-CV-W-FJG
        )
LAFARGE NORTH AMERICA, INC.,   )
        )
        Defendant.   )

# ORDER

Currently pending before the Court is LaFarge North America Inc. ("LaFarge's") Motion to Exclude the Report and Testimony of Plaintiff's Experts (Doc. # 142), Mid-Missouri Waste Systems, LLC's ("MMW's") Motion for Leave to File a Surreply (Doc. # 174); LaFarge's Motion for Judgment on Partial Findings Made at the Close of Plaintiff's Evidence (Doc. # 225); LaFarge's Motion for Summary Judgment at the Close of All the Evidence (Doc. # 228) and MMW's Motion to Exclude Portions of Mr. McLaughlin's Testimony and Ms. McDonald's Testimony From Trial (Doc. # 235).

## I. BACKGROUND

MMW, claims that Lafarge breached a Mineral Lease that Lafarge entered into with MMW.  MMW alleges that Lafarge's breaches of the lease have resulted in plaintiff being unable to construct a landfill on the property located around Sedalia, Missouri. MMW seeks monetary damages arising out of Lafarge's breaches of the Mineral Lease. On May 19 - 21, 2009, the Court held a bench trial on MMW's claims.  The Court now makes the following Findings of Fact and Conclusions of Law.

1. W.J. Menefee Construction Company ("Menefee" or "Landlord") owned and operated a quarry located in Sedalia, Missouri.  Menefee owned five tracts of land.  The common terms used to describe each tract of land are: Tract 1 ("Retained Property" in the Mineral Lease herein at issue), Tracts 2 and 2A ("Leased Property" in the Mineral

Lease), and Tracts 3 and 3A ("North Property" in the Mineral Lease) (collectively referred to as the "Sedalia Property" or "the Site"). (Plf. Exs. PX-92, PX-94; Tr. 15:9-17:3).

2. In the early to mid-1990's Menefee applied for and received a permit for the proposed "Menefee Sanitary Landfill, Permit Number 115907" ("Landfill Permit"). (Plf. Ex. PX-292; Tr. 10:12-11:16). Among other documents, the Landfill Construction Plans (Def. Ex. 5) (also referred to as "Engineering Drawings"), the Landfill Design Report (Def. Exs. 20, 21), and the Landfill Operating Manual (Def. Ex. 22) are incorporated into and made part of the Landfill Permit. (Plf. Ex. PX-92 ¶¶ 2, 4, 6).

3. The Landfill Construction Plans show the landfill footprint as being primarily contained within the Tract 1 boundaries. However, certain ancillary features, such as the New Chouteau Pit (the landfill sump drain) were originally designed to be located on Tract 2. (Def. Exs. 5 at 14-D, 390; Plf. Exs. PX-86, PX-92 ¶ (4)(a); Tr. 391:18-392:6, 557:23-558:23).

4. In July 1996, Menefee sold to Lafarge all of its ownership interest in Tracts 3 and 3A (North Property), while simultaneously entering into a Mineral Lease with Lafarge covering Tracts 1, 2, and 2A. (Tr. 15:9-17:6; Plf. Ex. PX-92).[1]

5. In August 2002, Menefee granted MMW a power of attorney to enforce the Mineral Lease. (Tr. 108:18-109:6).

6. Subject to the Mineral Lease, in March 2004, MMW ultimately purchased Menefee's remaining ownership interest in the Sedalia Property. (Tr. 102:21-103:15, 111:22-112:3).

---

[1] During trial the Court allowed the Asset Purchase Agreement and testimony related to it to come in as an offer of proof. The Asset Purchase Agreement attaches and refers to multiple relevant and important documents, such as a land survey (Tab 3-D to Def. Ex. 61), an environmental investigation (Tab M to Def. Ex. 61), and multiple other important documents that one would expect to find included in a transaction of this sort. However, nowhere attached to the Asset Purchase Agreement was a copy of the Landfill Permit. (Def. Ex. 61; Tr. 460:2-463:16).

## II. <u>THE MINERAL LEASE</u>

7. The Mineral Lease grants a surface and subsurface leasehold to Lafarge on Tracts 2 and 2A (the "Leased Property"), "including surface rights and all of the minerals, rock, and other materials located thereon or thereunder with the sole and exclusive right to mine, convert, and remove the same." (Plf. Ex. PX-92 ¶ 1). The Mineral Lease further provides that Lafarge is "permitted to mine, convert, and remove minerals, rock and other materials to the base of the limestone group designated as the 'Chouteau Group'...." (Plf. Ex. PX-92 ¶ 4(a)).

8. The term of the Mineral Lease is from July 1996 until June 30, 2026, with Lafarge having the option to extend the lease on the same terms and conditions for an additional 30 years. (Plf. Ex. PX-92 ¶ 2). Additionally, Lafarge is granted an exclusive option to purchase the Leased Property at any time during the term of the lease, including the renewal term. (*Id.* at 18).

9. The Mineral Lease specifically calls for the removal of the landfill's ancillary features from the Leased Property: "Landlord and Tenant shall use their best efforts to obtain the amendment of the Permit to remove the Leased Property from the area subject to the [Landfill] Permit . . . ." (*Id.*).

10. The Mineral Lease also grants Lafarge a right of entry onto the Landlord's Retained Property (Tract 1) for the purpose of "mining, converting, and removing minerals and rock to the base of the Burlington Group from the existing 'ledge' on the Landlord's Retained Property." The lease also gives the tenant a right of entry onto the retained property to: 1) operate and maintain the asphalt plant and crushing plant sold by Landlord to Tenant pursuant to the Asset Purchase Agreement; 2), to pump and remove water from the Lake for washing minerals and rock removed from Landlord's Retained Property, the Leased Property and the North Property; 3) to discharge wash water into a sediment pond located adjacent to the Chouteau Pit on Landlord's Retained

3

Property; 4) to discharge overflow from the sediment pond and other runoff water (but not wash water) into the Chouteau Pit; and 5) to meet its obligations to pump water from the Chouteau Pit into the Lake as described in paragraph 4(d) above, so long as, in Landlord's reasonable judgment, such activities do not violate or threaten to violate the rules, regulations and/or restrictions governing the Permit."

11. The lease provides that "the right of entry shall lapse as to the removal of minerals and rock and the operation of the asphalt plant and crushing plant upon Tenants' cessation for a period of 12 consecutive months of such activities on Landlord's Retained Property. The right on entry shall continue for the discharge and removal of water as described above so long as either Tenant or its successors and assigns is conducting mining operations on the Leased Property and/or the real property to the north of the Leased Property sold by Landlord to Tenant pursuant to the Asset Purchase Agreement."

12. The lease also states that the "Tenant shall stockpile upon Landlord's Retained Property all soil, clay suitable for use as landfill liner material, and other overburden materials removed by Tenant during its mining and extraction operations on the Landlord's Retained Property in such locations as reasonably depicted by Landlord from time to time, and such materials, together with the minerals and rock removed by Tenant, shall be Tenant's property." (Plf. Ex. PX-92 ¶ 6(a); Tr. 17:3-6).

13. The lease states that the following shall constitute a default or an "Event of Default" under the lease: "Tenant's failure to perform any of the terms, conditions or covenants of this Lease to be observed or performed by it for more than sixty (60) days after written notice thereof, or if such cure cannot reasonably be effected within such sixty (60) day period, the failure to commence the cure within such sixty (60) day period and diligently to pursue completion of the cure." (Plf. Ex. PX-92 ¶ 15).

4

### III. PLAINTIFF'S CLAIMS

### A. Failure to Pump the Chouteau Pit

14.  As noted above, under Paragraph 15 of the Mineral Lease, before an "Event of Default" can occur, the Landlord is required to give written notice to Lafarge of its alleged breach. Lafarge then has 60 days to cure the breach, or to commence the cure within 60 days and to diligently pursue completion of the cure. (Plf. Ex. PX-92 ¶ 15).

15.  On October 28, 2002, MMW sent Lafarge a notice of breach letter wherein it alleged three breaches of the Mineral Lease: (1) "water still remains" in the Chouteau Pit; (2) Lafarge breached the "perimeter stormwater channel on the west side of Tract 2;" and (3) Lafarge placed material on Tract 2 in areas designated for use for ancillary landfill features. (Plf. Ex. PX-86; Tr. 126:23-129:25). This notice did not raise any issue regarding the ditch or "storm water channel" running along the northern boundary of the Leased Property, nor did it raise any other alleged defaults under the Mineral Lease.

16.  In response to the October 2002 letter, Lafarge met with several MMW representatives to discuss its concerns. Lafarge denied that it was in breach of the Mineral Lease and concluded that MMW did not have a good understanding of the terms of the Mineral Lease. (Tr. 393:9-395:4). However, in order to show good will Lafarge began draining the water "as low as possible" from the Chouteau Pit, and made repairs to the drainage trenches. (Tr. 393:5-395:1). Additionally, Lafarge informed MMW that it did not believe that it was in breach of the Mineral Lease for placing its stockpiles on Tract 2 (land Lafarge leased) in the locations about which MMW complained. MMW responded that it would look into this and would advise Lafarge on that issue. From October 2002 until MMW filed its lawsuit in 2006, Lafarge was never contacted further about it. (Tr. 390:12-395:4).

17.  No additional notices of breach were sent to Lafarge until March 2006. (Tr. 393:2-4, 393:24-394:1, 399:6-400:1).

18.  On June 30, 2004, MMW sent Lafarge a written letter terminating Lafarge's right of entry onto Tract 1 and announcing MMW's plans to commence construction and operation of the landfill. No notice of any breach was contained in this letter.  (Plf. Ex. PX-101).

19.  On March 18, 2006—three and a half years since its first breach letter, and nearly two years after MMW terminated Lafarge's right of entry onto Tract 1—MMW sent Lafarge a second written notice of breach wherein MMW demanded that Lafarge: (1) pump water from the Chouteau Pit, (2) remove sediment from Menefee Lake, and (3) provide MMW with information regarding the overburden piles on Tract 1.  (Plf. Ex. PX-63; Tr. 400:2-5).

20.  The Burlington layer of rock resides on top of the Chouteau rock.  The feature commonly known as the Chouteau Pit was created when Menefee mined this area below the Burlington rock layer and down into the Chouteau rock layer.  The Chouteau Pit is approximately 70 or 80 feet deep.  When it is not pumped, the Chouteau Pit will fill up from surface water.  (Tr. 32:2-33:5).

21.  From 1996, when Lafarge acquired its interest in the Sedalia Property, through December 2004, when Lafarge ceased all mining activity, Lafarge maintained the water level in the Chouteau Pit at or below the level that Menefee kept it.  (Tr. 78:15-22, 418:9-419:1, 427:1-428:7).

22.  Mr. Menefee testified that he maintained the water level between the top of the Chouteau rock and the bottom of the Burlington rock. (Tr. 30:18-31:22; Def. Ex. 113).

23.  Mr. Fitzpatrick, who previously worked for Menefee and then continued his employment with Lafarge, also testified that Lafarge maintained the same water level in the Chouteau Pit as Menefee. (Tr. 78:15-22).

24.  Additionally, Mr. Stoker, who was in charge of pumping the Chouteau Pit

6

from September 2000 until the fall of 2001, also testified to maintaining the water level under the Burlington rock layer and within the Chouteau rock layer. (Tr. 418:9-419:1; 417:3-10; 417:25-418:8).

25. Topographical data also proves that Lafarge maintained the same water level as Menefee. Mr. McLaughlin reviewed the Landfill Construction Plans and the Landfill Design Report (which were created prior to Lafarge's involvement), and compared them to the 2002 Shaw Emcon topography that was done for MMW, and found that in 2002, Lafarge was actually keeping the water level a tenth of a foot lower than Menefee. (Tr. 556:18-557:13). The Landfill Design Report does indeed so state. (Def. Ex. 20 at pp. 2-3 (MMW 5780, MMW 5782)).

26. Lafarge increased its pumping of the Chouteau Pit after MMW complained in 2002. Upon receiving MMW's October 2002 complaint and request to have the water completely pumped out of the Chouteau Pit, Mr. Peart testified that he told his employees to ensure that the water was drained as low as possible. (Tr. Ex. 394:6-19).

27. No additional claims of breach were made until March 2006—long after Lafarge's obligation to pump the Chouteau Pit had ceased. (Tr. Ex. 393:24-394:1).

28. Mr. Crider's written reports provide further support that Lafarge kept the Chouteau Pit dry as it was requested to do in 2002. Mr. Crider's written activity report from June 28 through July 2, 2004 specifically states, "The Chouteau Pit is just about pumped out again, but we're supposed to have a big storm this weekend again." (Def. Ex. 138; Tr. 261:18-262:15). Mr. Crider's written report from July 12, 2004 also states, "Lafarge has just about got the Chouteau Pit pumped out again." (Def. Ex. 140; Tr. 262:16-263:8). Mr. Crider's written report from October 4 to October 15, 2004 also states, "Lafarge is doing a good job pumping the Chouteau Pit with all the rain." (Def. Ex. 143; Tr. 263:9-24).

29. MMW's own photographs also reveal that Lafarge was pumping the

7

Chouteau Pit dry.  (Tr. 264:24-265:25; Def. Ex. 73-E). When provided with photograph Def. Ex. 73-G, Mr. Crider again identified it as being a picture of a dry Chouteau Pit. (Tr. 265:25-266:7; Def. Ex. 73-G). When presented with photograph Def. Ex. 73-F, Mr. Crider testified that except for having a little puddle of water in the sump area of the pit, where water would be expected, the Chouteau Pit was dry.  (Tr. 266:12-25; Def. Ex. 73-F).  Mr. Crider further testified to taking a photograph on November 8, 2004 showing a dry Chouteau Pit.  (Def. Ex. 120-A).  In fact, Mr. Crider testified that it was his handwriting on the back of the photo.  (Tr. 267:1-24, 283:23-284:11; Def. Ex. 120-A).

30. Despite taking multiple photos of the site, not one MMW photo shows the Chouteau Pit full of water between 2002-2004.

31. Based upon the significant witness testimony, which was further supported by the multiple photographs from MMW's own witnesses, and supported by the lack of any photographs or credible testimony to the contrary, the Court finds that Lafarge complied with its obligation under the Mineral Lease to pump the Chouteau Pit at least through the end of 2004.

32.  In compliance with its mineral lease, Lafarge pumped the Chouteau Pit up until it ceased its mining operations in December 2004.  In its Second Amended Complaint, MMW asserts that Lafarge needs to continue pumping the Chouteau Pit "for so long as Lafarge continues mining operations . . . ."  (Doc. 74 at ¶ 32(a)) ("MMW contends the following: Lafarge is obligated to pump out the Chouteau Pit, and now the surrounding areas because of overflow from the Chouteau Pit, for so long as Lafarge continues mining operations on Tract 3 or any part of the Sedalia Property.") (emphasis added).

33.  When MMW terminated Lafarge's right of entry onto Tract 1 in June 2004, Lafarge was only obligated to pump the Chouteau Pit for so long as it was mining. Paragraph 6(a) of the Mineral Lease specifically states, "The right of entry shall continue

8

for the discharge and removal of water as described above **so long as** either Tenant [Lafarge] or its successors and assigns **is conducting mining operations** on the Leased Property and/or the real property to the north of the Leased Property sold by Landlord to Tenant pursuant to the Asset Purchase Agreement . . . ." (Plf. Ex. PX-92 ¶ 6(a)) (emphasis added).

34. All the evidence reveals that Lafarge stopped mining in December 2004 and MMW provided no evidence to the contrary. For example, Mr. Peart testified that Lafarge had not engaged in any blasting, extraction of rock or any type of mining activity since December 2004. (Tr. 402:8-11). Mr. Peart further testified that Lafarge relocated its crusher in December 2004. Mr. Peart testified that this large machinery is four times the size of the courtroom, meaning that it would take significant effort and expense to begin its crushing operations again. (Tr. 402:12-22).

35. Mr. Stoker further testified that Lafarge has not drilled, blasted or excavated any material at the Sedalia Property since late 2004. (Tr. 427:5-428:4). Moreover, Lafarge has not washed any material since the summer of 2004. (Tr. 428:5-7). Mr. Stoker also testified that Lafarge has not crushed any material at the Site since December 2004. (Tr. 427:1-4).

36. Additionally, Mr. Crider testified that when he left his employment with MMW in November 2004, he was aware that Lafarge would be shutting down and moving its crusher off the Site. And, when he returned in 2006, Lafarge was in fact gone and no longer mining at the Sedalia Property. (Tr. 274:2-14).

37. MMW offered no evidence that Lafarge engaged in mining after the end of 2004. Operation of an asphalt plant is not "mining" within the meaning of the Mineral Lease, which by its terms draws distinctions between "mining" and operating an asphalt plant by listing these operations separately under Paragraph 6(a) of the Mineral Lease. (Plf. Ex. PX-92 ¶ 6(a)).

9

38.  Therefore, because Lafarge was no longer mining the property, it was not obligated to continue to pump the Chouteau Pit.

**B. Failing to Remove Sediment From the Long Pond**

39.  MMW never provided written notice to Lafarge that it was in breach of the Mineral Lease for placing sediment in the Long Pond.  Despite its obligation to do so under Paragraph 15(a) of the Mineral Lease, MMW never sent Lafarge written notice of this alleged breach prior to filing litigation.  In fact, until filing its Second Amended Complaint (Doc. 74), MMW never complained about sediment being in the Long Pond, nor did it assert that placing sediment in the Long Pond would be a breach of the Mineral Lease.  (Tr. 148:3-17; Plf. Ex. PX-92 ¶ 15(a)).

40.  As explained in Paragraph 15(a) of the Mineral Lease, there can be no "Event of Default" until proper written notice is provided and Lafarge has the opportunity and the appropriate amount of time to cure the alleged breach.  (Plf. Ex. PX-92 ¶ 15(a)).

41.  Lafarge did not place any significant amount of sediment in the Long Pond. Lafarge used sediment ponds to control its sediment. Lafarge consistently used sediment ponds to control the placement of its sediment.  When mining on Tract 1, Lafarge placed its sediment in a sediment pond adjacent to the Chouteau Pit.  (Tr. 69:18-23, 423:7-424:3; Def. Ex. 400-A).[2]  When Lafarge mined on Tracts 2 and 3, Lafarge relocated its crushing plant to Tract 2 and began placing its wash water into a concrete pit under the crushing plant, which would allow some of the sediment to settle out of the water.  (Tr. 71:13-24).  Then Lafarge would pump the wash water into a sediment pond that it constructed, which was located on the southwest corner of Tract 2 and north of the Long Pond, and is marked with a number "5" on Def. Ex. 400-A ("Sediment Pond No. 5").  Once the sediment settled out, the clean water would eventually make its way into the Long Pond and then back into the sediment pond

---

[2] While the Court's Exhibit Index correctly lists Def. Ex. 400-A, it is incorrectly listed in the trial transcript as Def. Ex. 42-A.  However, no Def. Ex. 42-A was used at trial.

adjacent to the Chouteau Pit, which Lafarge would, in turn, pump into Menefee Lake. (*Id.*; Tr. 68:2-73:1; Def. Ex. 400-A).

42. The Sediment Pond No. 5 (also depicted on Def. Ex. 390-F), still has the capacity to collect sediment, including having several feet of "free board." (Tr. 544:25-545:5; Def. Exs. 400-A, 390-F).

43. However, in anticipation of its Sediment Pond No. 5 filling up, Lafarge took preventative measures, and during the summer of 2004, Lafarge constructed a supplementary sediment pond adjacent to and directly west of Sediment Pond No. 5. (Tr. 425:21-426:25, 436:7-14). However, Lafarge stopped washing its material in the summer of 2004, so Lafarge had no need to use the supplementary sediment pond very often. (Tr. 426:15-17). As a result, there is very little sediment in this pond. (Tr. 545:6-10).

44. Additionally, when it came time for Lafarge to raise the walls of its Sediment Pond No. 5, it created a temporary alternative location for placing its sediment. This location was just south of its Sediment Pond No. 5 and north of the Long Pond, and is depicted in Def. Ex. 73-C. In order to ensure that sediment was confined to this area, Lafarge constructed a berm to collect the sediment and backed it with boulder rocks. (Tr. 72:4-21; Def. Ex. 73-C). These aerial photographs show this berm is still in existence with plenty of free board on the upstream side. (Def. Exs. 400-A, 73-C).

45. When asked on cross examination if it has always been Lafarge's practice to utilize all best practice methods available for controlling its sediment, Mr. Joe Fitzpatrick responded, "Yes, Lafarge always used best practices, and that's something that was very stressed." (Tr. 73:19-74:1). Mr. Fitzpatrick testified about this practice that was used for approximately a month or so while he was employed by Lafarge. Mr. Fitzpatrick left Lafarge at the end of 2003. (Tr. 57:3-12, 70:3-8).

46. Ms. Meghan McDonald, Lafarge's Director of Environment and Public Affairs

for Lafarge Western U.S. and Latin America, who trains operational teams on how to comply with best management practices, including best management of its sediment, testified that it was an acceptable best practice to temporarily use a berm supported by additional boulder rock to control sediment disbursement while Lafarge heightened its walls on Sediment Pond No. 5. (Tr. 478:22-479:2, 495:22-496:22, 499:22-500:3).

47. The Court was presented with no evidence that any substantial quantity of sediment would have been discharged directly into the area now occupied by the Long Pond.

48. Photographic evidence shows no sediment in the Long Pond. Mr. Rick Crider, MMW's former employee and witness, testified to taking multiple photographs of the Site, including the taking of at least three photographs in the fall of 2004 showing the Long Pond floor. (Def. Exs. 120-1, 120-2, 120-3). When questioned as to whether his photographs revealed sediment in the bottom of the Long Pond, he replied, "Well, there wouldn't be." (Def. Exs. 120-1, 120-2, 120-3; Tr. 270:15-272:15). Despite Mr. Crider taking multiple photos of the Site, he did not recall taking any photographs showing sediment in the area occupied by the Long Pond. (Tr. 272:11-25).

49. Mr. Fitzpatrick, MMW's witness, also identified Def. Ex. 120-1 as a photograph of the Long Pond floor taken while looking southeast towards the overburden pile, and revealing a solid rock surface. (Tr. 76:8-13). When asked if this is what the Long Pond floor looked like when he left his employment with Lafarge in December 2003, he responded, "[y]es, it was relatively dry. There were a few slightly low areas that had some water in, but, yeah, that's what it looked like." (Tr. 76:17-21; Def. Ex. 120-1). Mr. Fitzpatrick further identified Def. Ex. 120-2 as a photograph of the bottom of the Long Pond looking toward the east end of the Long Pond floor. Again, he identified this photograph as depicting a solid surface at the bottom of the Long Pond. When asked if there was a lot of sediment covering the bottom of the Long Pond floor

12

when he left, he responded, "No you could walk across there and drive on that." When asked if he had in fact walked across the bottom of the Long Pond floor, he replied, "When it was pumped dry, yes." (Tr. 77:1-15). He further testified that if the Long Pond floor would have had 17 feet of sediment on the bottom of it (as MMW contends), he would not have walked across it. (Tr. 77:16-78:1). Moreover, Mr. Fitzpatrick identified Def. Ex. 120-3 as a photograph of the Long Pond floor, which was taken at the south end of the Long Pond looking north. When asked if the photograph depicted a solid surface at the bottom of the Long Pond, he responded, "Yes, it does to me" and when asked if there appeared to be any sediment in the bottom of it, he answered, "I don't see any there." (Tr. 78:6-78:14).

50. MMW took many photographs of the Sedalia Property at times after 2002 when MMW had claimed Lafarge was in breach of the Mineral Lease, yet MMW did not produce any photographs showing any sediment in the area of the Long Pond. If Lafarge's water handling practices were as MMW claims, the Court would have expected MMW to have taken photographs of those activities or of the sediment supposedly discharged. With the exception of sediment properly located in Lafarge's sediment ponds, no photographic evidence was produced showing 17 to 19 feet of sediment anywhere at the Sedalia Property.

51. Mr. Kevin Stoker testified to actually driving his truck across the bottom of the Long Pond floor in December 2004, and further testified that had there been sediment in the floor of the Long Pond, he would not have driven his truck across it. (Tr. 419:13-420:9, 434:18-24). When questioned as to whether he ever witnessed any sediment material in the Long Pond area, he replied, "No." (Tr. 420:4-6).

52. Topographical evidence demonstrates there is no substantial sediment in the area now occupied by the Long Pond. Even though topographical data was produced with Mr. Michael McLaughlin's expert report, Mr. Coughlin testified that he never

13

reviewed the available topographical data that was developed in January 1996, shortly before Lafarge acquired its interest in the property. (Tr. 211:4 - 212:5; Def. Exs. 309-A, 390, 391).

53. Mr. McLaughlin took this 1996 topographical evidence and analyzed it against Mr. Coughlin's measurements. In doing so, he created Def. Exs. 390-B, 309-A, 309-A-1 and 280-H-1, by placing overlays of Mr. Coughlin's data on top of 1996 and 2002 topographical data in the same area. Each of these were discussed at length during his testimony. When comparing the 1996 topographical evidence to Mr. Coughlin's current measurements, Mr. McLaughlin discovered that in those areas where rock had previously been mined by Menefee, the Long Pond floor elevation remained the same today as it existed in January 1996. (Tr. 529:20-536:23; Def. Exs. 390-B, 309-A, 309-A-1, 280-H-1). There was no evidence of added sediment. And obviously, the floor in the northern area of the Long Pond is much lower (not higher) today than what it was in 1996 because Lafarge has since done additional mining in that area. (*Id.*).

54. Likewise, Mr. Coughlin failed to realize that MMW's own 2002 topographical drawings depicted the northern area of the Long Pond (the area that Mr. Coughlin purports to contain approximately 17 to 19 feet of sediment) as having a rock floor elevation of 760 feet. Instead of basing his measurements off of this 2002 topographical data, Mr. Coughlin assumed a much lower floor elevation of 740 feet. Again, Mr. Coughlin incorrectly derives his elevation of 740 feet from the Landfill Construction Plans, which were created using a Burlington rock ledge (not a floor elevation) of 740 feet above mean sea level. As stated above, Mr. Coughlin provided no evidence that Lafarge (or anyone else) had actually gone in and mined the Long Pond floor to an elevation of 740 feet.

55. Mr. McLaughlin compared Mr. Coughlin's measurements to the 2002

14

topographical data and concluded the northern Long Pond floor elevations are within a couple of feet of each other. (Tr. 536:24-540:6; Def. Exs. 8-A-1, 280-H). In the area where Mr. Coughlin believed the sediment was deepest, Mr. McLaughlin found Mr. Coughlin's elevation and the 2002 elevation to be "just about exactly the same number." (Tr. 537:21-539:1). This demonstrates that Lafarge could not have placed 17 to 19 feet of sediment in this area.

56. Photographic evidence clearly depicts that there are two very steep piles of overburden and clay material on either side of the Long Pond. For example, when Mr. Fitzpatrick was questioned about Def. Ex. 101, he testified that clay and other materials may be coming off of these piles and going down into the Long Pond. (Tr. 83:20-84:18). If there was any significant sediment in the Long Pond area, which Lafarge denies, Mr. Coughlin did not account in his analysis for the amount Menefee may have left, or for the amount attributable to runoff and erosion from surrounding overburden piles.

57. Lafarge had written permission from Menefee to place its sediment in the Long Pond. Mr. Menefee testified that the Lafarge and the Menefee Joint Mine Plan specifically allowed Lafarge to place its overburden and spoil material (*e.g.*, sediment, mining waste) in the exact area of the Long Pond that MMW is now complaining about. (Tr. 40:6-43:3; Def. Exs. 54, 54-A). Mr. Menefee identified a circle around the northern portion of the Long Pond, the very area that Mr. Menefee testified that Lafarge had permission to place its material, and the area which Mr. Coughlin alleges that it contains multiple feet of sediment. Thus, even if Lafarge had placed sediment in the Long Pond (which it did not), it had written permission to do so.

58. In addition, the Mineral Lease explicitly allows "mining, converting, and removing minerals" on Tract 1, the very processes that Lafarge utilized in its crushing and washing operations on Tract 1, and the very same process that Menefee used. (Tr.

15

69:17-23).   The Mineral Lease specifically allows Lafarge "to discharge overflow from the Sediment Pond and other runoff water (but not wash water) into the Chouteau Pit," which is what Lafarge was doing.  (Plf. Ex. PX-92 ¶ 6(a); Tr. 70:17-72:3, 423:7-425:15).

59.  MMW offered no evidence that placing sediment in the Long Pond area was a violation of MMW's Landfill Permit.  In relation to Tract 1 only, Paragraph 6(a) of the Mineral Lease grants Lafarge the right of entry onto Tract 1 to conduct a variety of activities, including mining and washing of its rock, so long as Lafarge's activities on Tract 1 do not "violate or threaten to violate the rules, regulations and/or restrictions governing the Permit or which otherwise may be imposed by MDNR," under the Mineral Lease.  (Plf. Ex. PX-92 ¶ 6(a)).

60.  At trial, Mr. Patrick Mazza could not offer even one activity—sediment placement or otherwise—that Lafarge did that "violate[d] or threaten[ed] to violate the rules, regulations and/or restrictions governing the Permit, or which may otherwise be imposed by MDNR."  (Tr. 120:14-121:10).

61.  The Mineral Lease imposes no obligation on Lafarge to conduct any mining in the Long Pond area or to maintain the Long Pond floor to any certain elevation, except not to mine below the Burlington rock.

62.  The testimony, photographic evidence and topographical evidence show that Lafarge could not have placed any significant amount of sediment in the area of the Long Pond.  Even if it did so, it had the express permission of Menefee to do so as established by the Menefee and Lafarge Joint Mine Plan.

## C. Failing to Remove Sediment from Menefee Lake

63. The third sentence of paragraph 9 of the Lease states: "Lafarge shall be solely responsible for periodically removing sediment from the Lake."  The term "periodically" is not defined in the Lease.

64.  Mr. Menefee testified that he had a large screenings pile present at the Site

16

just west of where Menefee Lake is located. (Tr. 44:10-13). When questioned about a photograph showing a pile (Def. Ex. 113), Mr. Menefee testified that the large pile in the center of the picture was screenings material. He stated that this pile was not moved when Menefee Lake was built. (Tr. 44:18-45:1, 45:13-16; Def. Ex. 113). Mr. McLaughlin testified that the material was screenings and not sediment and that he had personally visited the site and felt the material with his hands. (Tr. 547:10-21; Def. Ex. 390-H). Mr. McLaughlin also testified to reviewing several historical photographs including photographs taken in 1995 and photographs taken sometime between late 1996 and May 1999. Based on his review of the photograph comparisons, and his personal visits to the Site, it is Mr. McLaughlin's expert opinion that the material going into Menefee Lake is primarily screenings and not sediment. (Tr. 549:14-552:20; Def. Exs. 391-A, 391-B).

65. The Mineral Lease does not require Lafarge to remove screenings from Menefee Lake. The Mineral Lease, negotiated between experienced quarry operators, Mr. Menefee and Lafarge, employed numerous terms of art, and imposed upon Lafarge an obligation to remove "sediment" from Menefee Lake, not "screenings" or any other material.

66. To the extent that sediment exists in Menefee Lake, it is *de minimis.* When Mr. McLaughlin was questioned about how much sediment he believed was located in Menefee Lake, Mr. McLaughlin replied:

> Based on the information that we have, it's very difficult to say that there's any significant amount of sediment in the lake. In my expert report I talked about how there might be as much as a hundred feet of lake that was taken up by sediment and I did some calculations to conclude that there was maybe five thousand or six thousand cubic yards, but I said you can't really say that's sediment because the problem is that I think that the lake had -- that the water level was down so you would expect a little more shore to be revealed if the water level came down. So, I don't think that there is anything more than that there, five or six thousand cubic yards, and probably less. In the work that -- in looking at the work that Mr. Coughlin included in his report, it's very difficult to say that there is any

17

appreciable amount of sediment in the lake.

(Tr. 552:23-553:14).

67.  The design water elevation of Menefee Lake is 771 feet above mean sea level.  (Tr. Ex. 548:5-8). When Mr. McLaughlin compared Mr. Coughlin's 2008 sounding data against the 1996 and 2006 topographical elevations of the Menefee Lake floor, it revealed that the floor elevation in 2006 (two years after Lafarge stopped mining) was almost identical to the floor elevation in January 1996.  This can only mean that the floor elevation remains the same today as it did in 1996—prior to Lafarge's involvement. Hence, there is not a significant amount of any material in Menefee Lake, let alone large amounts of sediment placed there by Lafarge.  (Tr. 553:15-556:14; Def. Exs. 390, 391).

68.  While Paragraph 6(b) of the Mineral Lease states that Lafarge is responsible for "periodically" removing sediment from Menefee Lake for so long as Lafarge is conducting mining operations on either Tracts 1, 2, 2A, or 3, MMW has failed to produce any evidence that Menefee Lake is in need of sediment removal today, let alone back in 2004 when Lafarge ceased all of its mining operations.  (Plf. Ex. PX-92 ¶ 6(b)).

69.  Even assuming that Mr. Coughlin took accurate measurements years after Lafarge ceased all of its mining operations, Mr. Coughlin's data indicates that Menefee Lake is only 39% silted-in with sediment.  Even given this disputed data, the Missouri Department of Natural Resources ("MDNR") still does not require Menefee Lake to be dredged.  The Landfill Operating Manual, which was approved by MDNR and coincidentally authored by MMW's own expert witness, Mr. Bowen, controls the operations at this very site.  This Landfill Operating Manual provides that Menefee Lake shall be "cleaned out of accumulated sediment if the water depth is less than 2 feet over 80% of the original pond area." (Def. Ex. 22 at p. 25).  Not one of MMW's alleged experts testified that the lake contained anywhere close to this amount of sediment. Thus, according to the approved MDNR standards regulating when Menefee Lake

18

needs to be dredged of sediment, Menefee Lake is nowhere close to requiring dredging. (Def. Ex. 22; Tr. 316:20-317:11, 319:13-19).

70. At trial, Mr. Bowen testified to making several errors, including the acknowledgment that the Landfill Operating Manual, which he authored and MDNR approved, with respect to the sediment issue, was in error. Mr. Bowen testified that water samples taken under the National Pollutant Discharge Elimination System ("NPDES") would be the best indication as to whether the legal requirements under the Clean Water Act were being met. (Tr. 303:7-304:1, 317:12-18). Whether the Court uses Mr. Bowen's original views expressed in the Landfill Operating Manual or the new standard espoused in his trial testimony, the result is the same. Lafarge's NPDES permit controls the frequency of the water samples taken from Menefee Lake. It also regulates the limits of pH, settable solids, and oil and grease that can be present in Menefee Lake before an obligation to mitigate the situation arises. (Def. Ex. 262-E; Tr. 483:19-484:24).[3]

71. In compliance with its NPDES permit, Lafarge monitors Menefee Lake by taking water samples and forwards them to an independent laboratory for analysis. (*Id.*; Tr. 484:25-485:3). Each and every water sample taken from Menefee Lake has tested substantially below the allowable limits for sediment, and it often tests so low that sediment levels cannot even be detected. (Tr. 485:4-488:22, 489:4-492:6; Def. Exs. 275-A, 275-C).

72. The Court determines that based on the evidence adduced at trial, Menefee

---

[3] The Court permitted Lafarge's NPDES Permit (Def. Ex. 262-E) to come in as an offer of proof. The NPDES Permit and testimony related to it were offered in response to MMW's expert, Mr. Bowen's testimony that the NPDES Permit would control when it was time to dredge Menefee Lake of sediment instead of the Landfill Operating Manual. As the Court can see from review of the actual testing results both taken from the fall of 2004 (when Lafarge stopped mining) and again in the fall of 2008, the water sampled from Menefee Lake falls significantly under MDNR's allowable limits as included in the NPDES Permit. (Def. Exs. 262-E, 275-A, 275-C). Because MMW "opened the door" on this issue, Lafarge respectfully submits that Def. Ex. 262-E should be admitted on the merits.

Lake is not in need of sediment removal currently or in the past.

**D. <u>Failure to Maintain Drainage Ditches</u>**

73. The Mineral Lease nowhere obligates Lafarge to construct, maintain, or repair drainage ditches. MMW has not pointed the Court to any provision of the Mineral Lease that even mentions the word "ditch" or "drainage trench," much less one that obligates Lafarge under the Mineral Lease to maintain such ditches or trenches. The Court has examined the Mineral Lease for such an obligation, and the Court concludes the Mineral Lease imposes no obligation on Lafarge to construct, maintain, and/or repair drainage ditches or trenches. (Plf. Ex. PX-92).

74. Although MMW contended that Menefee constructed the drainage ditches, the evidence is that Lafarge actually paid Menefee to construct them. When Mr. Menefee was questioned about constructing the ditches at the request of Lafarge, he testified that his company and Lafarge reached an agreement to construct some ditches on the property. (Tr. 38:14-40:1; Def. Ex. 61-A).

75. Mr. Wayne Lyons, whose name appears on the executed Mineral Lease, further testified that Lafarge had a side agreement with Menefee to pay for and have Menefee construct the ditches for Lafarge. (Tr. 469:8-12).

76. Mr. McLaughlin provided very credible testimony that the ditches were constructed and paid for by Lafarge for use in the quarry and not at all for the Landfill. (Tr. 587:17-19; Def. Exs. 5, 390, 391).

77. Until filing litigation, MMW never alleged that Lafarge breached the ditch running east to west on the north end of Tract 2 (the "North Ditch").

78. In October 2002, MMW complained that Lafarge had damaged the ditch that runs north to south from Tract 1 to Tract 2 on the west side of Tract 1 (the "West Ditch"). (Plf. Ex. PX-86).

79. Lafarge denied that it was in breach of the Mineral Lease and concluded that

20

MMW did not have a good understanding of the terms of the Mineral Lease. (Tr. 393:9-19). However, in order to show good will and to be a good neighbor, Lafarge made the requested repairs to the "West Ditch." (*Id.*).

80. In March 2006—well over a year since Lafarge had stopped operating the Sedalia Quarry and nearly two years since MMW terminated Lafarge's right of entry onto Tract 1—MMW sent another letter regarding additional issues, but did not mention any claims about Lafarge damaging the ditches.

81. Now for the first time during litigation, MMW appears to claim that Lafarge has breached the North Ditch. When asked how the trenches have changed since Mr. Menefee constructed them, he responded:

> A. The west side of the -- the east side of the north ditch has been excavated out by Lafarge in their quarry operation. Thereby, they cut off the drainage purpose of the perimeter ditches to where they no longer serve a purpose.
> Q. So are you referring to the ditch that takes the water toward the lake on the north side of the property?
> A. Yes.

(Tr. 25:14-21)

82. In order for Lafarge to commit an "Event of Default," it must first receive written notice of the alleged breach and be provided the 60 days to cure the breach. (Plf. Ex. PX-92 ¶ 15(a)). In this case, not only did MMW fail to provide Lafarge with written notice of this breach prior to filing its lawsuit, but its Second Amended Complaint does not even allege that Lafarge had breached the "North Ditch," which is located entirely on Lafarge's Leased Property, on Tract 2. It only alleges a breach to the "West Ditch" location on Tract 1. (Doc 74 ¶ 34 (d)).

83. Again, when MMW alleged in October 2002 that Lafarge breached the lease by damaging the west ditch, Lafarge—despite no obligation to do so—made the requested repairs and MMW never complained about it again.

84. Regardless of whether MMW complains about the "West Ditch" or the "North

21

Ditch" or both ditches, there was no evidence at trial that Menefee or MMW ever provided Lafarge with the Landfill Construction Plans that MMW accuses Lafarge of breaching. For example, Mr. Lyons testified that he never received a copy of the Landfill Construction Plans, nor the Landfill Operating Manual, nor the Landfill Design Report, nor did he receive any guidance on how to comply with them. (Tr. 467:23-469:7; Def. Exs. 5, 20, 21, 22).

85. Mr. Patrick Mazza, the owner of MMW, testified that he was not aware that Lafarge had ever been furnished with the Landfill Construction Plans. (Tr. 121:11-122:7).

86. Lafarge cannot be held responsible for construction of ditches—or for any other obligations—in plans that Lafarge had not been given, and that the Mineral Lease does not obligate Lafarge to observe.

87. Even if Lafarge had received those documents, the ditches currently in place on the property are not the same ditches depicted in the Landfill Construction Plans. (Tr. 557:18-560:8, 587:17-19; Def. Exs. 5, 390, 391).

88. When Mr. McLaughlin was specifically questioned about his expert opinion as to whether the ditches currently in place are those required by the Landfill Construction Plans, he responded:

> Q. What conclusions, if any, did you reach about whether the ditches that are shown in the plans were actually constructed at the site?
> A. The ditches that are shown on the plans are not those present on the site.
> Q. And let's be very specific. Let's talk about the ditch that runs east/west across the top of Tract 2.
> A. Right. There's no ditch shown in the construction drawings in that location. There's no ditch along Yeater Road that's shown in the construction drawings.
> (Tr. 557:18-558:2).
> Q. . . . Can you tell the court -- can you explain the drawing to the court and to me as to where the ditch currently is and where the plans call for it to be?
> A. The east/west ditch that we've been talking about is running right along

22

Yeater Road and turning and dropping down into the Menefee Lake discharge. The permit drawings don't contemplate dropping the water all that distance. They're going to bring the water down to get it down to the floor of the quarry, and then drop it at what amounts to a bathtub drain at the New Chouteau Pit. The whole idea of this to replace the old Chouteau Pit with the new Chouteau Pit is like a bathtub drain, and that's where water is supposed to be dropped according to the construction drawings. And that's about 400 feet, 500 feet south of Yeater Road and the ditch along Yeater road.

Q. Is the north/south ditch that runs along Snow Road, is it shown -- the one that's there now at the site, is it shown in the construction drawings?

A. I don't think so.

(Tr. 558:3-559:2).

89. Additionally, MMW's own expert witness, Mr. Bowen, clearly testified that the "North Ditch" currently located at the Site (the one that MMW is now complaining about) is actually hundreds of feet north of the ditch described in the Landfill Construction Plans:

Q. Now, again referring to Sheet 11 of 55 of Exhibit 5, the plans call for the east/west edge to run along this line that is south of the 5000 center line mark, right?

A. Right.

Q. I guess you call that transect 5000, or what would you call it?

A. It's Baseline Station 50.

Q. Thank you. Baseline Station 50. But the ditches that are actually at the site are north, just north of Baseline Station 50, correct?

A. Right.

(Tr. 327:20-328:6).

90. Even assuming that Lafarge had an obligation to maintain the ditches that were to service the landfill, the ditches currently in place are not those ditches that the Landfill Construction Plans describe.

91. Additionally, Mr. Bowen admitted that the Landfill Construction Plans—that he created—do not call for the "West Ditch" to be constructed until much later in the construction of the landfill (after multiple cells have been filled). (Tr. 330:7-331:24).

92. Thus, the Court concludes that Lafarge did not breach the Mineral Lease for failing to maintain the ditches, as the lease placed no obligation on Lafarge to do so.

23

### E. Failure to Remove Overburden Material

93.  As a lessee of surface and subsurface mineral rights, Lafarge has broad and compelling authority to place its material where it chooses on Tract 2. The Mineral Lease grants Lafarge exclusive rights to the surface and subsurface, including "surface rights and all of the minerals, rock, and other materials located thereon or thereunder with the sole and exclusive right to mine, convert, and remove the same."  (Plf. Ex. PX-92 ¶ 1).

94.  The parties clearly understood at the time of entering into the Mineral Lease that Lafarge, as the surface and subsurface mineral rights lessee, would have broad power and discretion to place its material on the Leased Property in any location that it chose.  This is evidenced by the Mineral Lease containing no restrictions whatsoever as to where Lafarge can place its material on Tracts 2 or 2A.

95.  Additionally, the Mineral Lease releases Lafarge from any and all liability if its removal of minerals, rock and materials, which causes the Retained Property (Tract 1) to be unusable as a landfill.  The Mineral Lease specifically states:

> In the event the removal of such minerals, rock and materials to the base of the Chouteau Group shall impair or cause the Landlord's Retained Property to be unusable as a solid waste disposal area, Seller releases Buyer from any and all responsibilities, liabilities and costs due to such nonuse.

(Plf. Ex. PX-92 ¶ 4(a)).

96.  Aerial photos taken during Mr. Menefee's ownership of the Site, and afterward, clearly illustrate the total destruction of the surface and subsurface areas occasioned by surface mining, and the creation of overburden piles, material stockpiles, and waste materials as part of a surface mining operation.  (Def. Exs. 101, 103, 107, 109, 111, 112, 113).  That is precisely what the parties contemplated in a lease of real property for surface mining.

24

97. Mr. Kevin Peart testified to the destructive nature of surface mining when he testified that it included, "overburden removal, drilling and blasting, blasting, extraction of the raw material, the rock. And, then [Lafarge] would put it into [its] plant where the conversion process would take that material and turn it into smaller particles for [its] out sales." (Tr. 401:13-20).

98. Nothing contained anywhere in the Mineral Lease restricts Lafarge from placing its stockpiles in any location that it chooses on its Leased Property (Tracts 2 and 2A). (Plf. Ex. PX-92).

99. Menefee never objected to Lafarge's placement of its materials on any of the Tracts, Including Tract 2 and MMW never properly followed through with its notice of Breach.

100. Menefee owned Tract 2 until March 2004, and at no time did Menefee ever complain about the location of Lafarge's stockpiles on Tract 2. (Tr. 142:22-23). Mr. Menefee testified that Lafarge was permitted to place its overburden exactly where Lafarge placed it:

Q.      So as far as you are concerned, all of the overburden that Lafarge moved on Tract 1 and Tract 2 was put in a place where Lafarge was permitted to put it, correct?

A.      According to our contract, yes.

(Tr. 29:13-16).

101. Additionally, after MMW sent its written notice of breach in October 2002, Lafarge met with MMW and challenged its assertion that Lafarge was in breach of the Mineral Lease for placing its stockpiles on Tract 2. MMW responded that they would look into it, but MMW never followed up with any additional breach notices or attempted to contact Lafarge to discuss further.

102. Nothing more was mentioned about stockpiles that Lafarge had allegedly

improperly placed upon Tract 2 until MMW filed its lawsuit in 2006. (Tr. 390:12-394:19; Plf. Ex. PX-86, ¶ 14 above). Consistent with the testimony that Lafarge offered at trial, MMW's March 2006 breach notice did not complain about Lafarge's stockpiles on Tract 2, and instead only complained about overburden piles placed on Tract 1, which was not an issue that was tried. (Plf. Ex. PX-63).

103. MMW offered no evidence at trial as to when Lafarge allegedly placed the offending material on Tract 2—whether it was during 1996 through 2002 (when Mr. Menefee approved such activity) or later (when MMW claims, despite its lack of proper notice, that it objected). MMW has not contended that Lafarge should be held responsible for placing materials in a location authorized by the owner at that time, nor can Lafarge be held responsible for activities undertaken without objection by the then-current owner.

104. MMW argued extensively that MMW would endure great expense in removing Lafarge's material from Tract 2, which MMW alleges is located in the same area in which MMW needs to construct its New Chouteau Pit. While making this argument, MMW completely ignores the language in the Mineral Lease that (I) gives Lafarge a 30-year lease on the property with an option to extend an additional 30 years, (ii) grants Lafarge an exclusive option to purchase the Leased Property [Tracts 2 and 2A], and (iii) requires the parties to work together in removing Tract 2 from the Landfill Permit. (Plf. Ex. 92 ¶¶ 2, 4(a), 18).

105. Paragraph 4(a) of the Mineral Lease specifically states, "Landlord and Tenant each shall use their best efforts to obtain the amendment of the Permit to remove the Leased Property [Tracts 2 and 2A] from the area subject of the Permit…." (Plf. Ex. PX-92 ¶ 4(a))

106. Mr. Gene Bowen stated at trial that the Chouteau Pit could be placed anywhere and that it does not have to be in any specific location. (Tr. 326:12-21).

107.  Given that (I) the Mineral Lease does not restrict Lafarge from placing its material anywhere it desires on Tract 2, (ii) Mr. Menefee's approval of Lafarge's stockpile placement, (iii) the Mineral Lease requirement that Tract 2 was to be removed from the Landfill Permit, (iv) MMW's own expert witness testimony that the New Chouteau Pit can be located anywhere and (v) the failure of MMW to provide adequate notice of breach and allow for a time to cure,  the Court finds that MMW has failed to prove that Lafarge was in breach of any obligation under the Mineral Lease for placing its stockpiles in the locations that it did on Tract 2.

**F.  Discharge of Water From Tract 3**

108.  Through Mr. J.R. Warren's testimony, MMW apparently claimed at trial that Lafarge discharged water from Tract 3 into Menefee Lake.  Despite the notice of breach provisions in Paragraph 15(a) of the Mineral Lease, MMW never sent Lafarge a written notice contending this activity was a breach of the Mineral Lease, nor did MMW allege that this activity was a breach in its Second Amended Complaint.  (Doc 74) (Plf. Ex. PX-92 ¶ 15).

109.  MMW has not identified any damage occasioned by the water discharge.

110.  At trial, Mr. Warren testified that Lafarge would occasionally pump water from the quarry pit on Tract 3 onto its Leased Property (Tract 2), which would then travel through the ditches and naturally drain into Menefee Lake:

> Q. Now, Mr. Warren, regarding the pumping on Tract 3, did you pump it directly into Menefee Lake?
> A. No.  We pumped it onto Tract 2 to where the drainage ditch is located, and then it would follow the drainage ditch [into Menefee Lake].

(Tr. 350:23-351:3).

Even though Mr. Warren testified that Lafarge had pumped its water from Tract 3 in this same manner since 2002/2003, it was such a non-issue that MMW claims to have had no knowledge about it until first learning about it during Mr. Warren's

deposition, which was taken in November 2008. This is despite MMW often having employees on site during 2003, 2004 and 2006. (Tr. 342:23-343:4).

111. MMW has identified no provision of the Mineral Lease that would be violated by Lafarge draining its quarry pit on Tract 3 in this manner. (Plf. PX-92). Paragraph 14 of the Mineral Lease specifically requires Lafarge to "comply in all material respects with all of the requirements of all county, municipal, state, federal and other applicable government authorities … including but not limited to all applicable federal, state, and local laws pertaining to air, and water quality … and other environmental matter and rules, regulations and ordinances of the United States Environment al Protection Agency, the MDNR, and all other applicable federal, state, and local agencies and bureaus." (Plf. Ex. PX-92 ¶ 14). If Lafarge needs to pump its water from its pit on Tract 3, Lafarge's NPDES permit, which is governed by MDNR (as listed above) requires Lafarge to pump it exactly how Lafarge is doing it. Lafarge is then required to take a quarterly non-storm water discharge sample (a/k/a "process water sample") out of Menefee Lake. (Def. Ex. 262-E). Lafarge always took water samples from Menefee Lake when required, and they all came back within normal limits. (*Id.*).

112. In fact, MMW failed to prove that it encountered any damages as a result of Lafarge pumping water from Tract 3 through the ditches into Menefee Lake.


IV. **CONCLUSION**

Accordingly, the Court hereby **DENIES AS MOOT** LaFarge's Motion to Exclude the Report and Testimony of Plaintiff's Experts (Doc. # 142); **DENIES AS MOOT** Plaintiff's Motion for Leave to File a Surreply (Doc. # 174); **GRANTS** LaFarge's Motion

28

for Judgment on Partial Findings Made at the Close of Plaintiff's Evidence (Doc. # 225) and **GRANTS** LaFarge's Motion for Summary Judgment at the Close of All the Evidence (Doc. # 228) and **DENIES** MMW's Motion to Exclude Portions of Mr. McLaughlin's Testimony and Ms. McDonald's Testimony From Trial (Doc. # 235).


Date:   09/28/09                              **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                         Fernando J. Gaitan, Jr.
                                              Chief United States District Judge